ROBBINS LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsllp.com
KEVIN A. SEELY (199982)
kseely@robbinsllp.com
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

[Additional Counsel on Signature Page]

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATHERINE M. SUGARBAKER FAMILY TRUST, MICHAEL MONGIELLO TRUSTEE, U/A DTD 11/08/21, Derivatively on Behalf of CUMMINS INC., <br><br> Plaintiff, <br><br> v. <br><br> JENNIFER W. RUMSEY, N. THOMAS LINEBARGER, MARK A. SMITH, ROBERT J. BERNHARD, BRUNO V. DI LEO ALLEN, STEPHEN B. DOBBS, GARY L. BELSKE, CARLA A. HARRIS, THOMAS J. LYNCH, WILLIAM I. MILLER, GEORGIA R. NELSON, KIMBERLY A. NELSON, KAREN H. QUINTOS, FRANKLIN R. CHANG DIAZ, ALEXIS M. HERMAN, and ROBERT K. HERDMAN, <br><br> Defendants, <br><br> -and- <br><br> CUMMINS INC., an Indiana Corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND CONTRIBUTION <br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff, by its attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Contribution.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), a review of material published on the U.S. Department of Justice ("DOJ") website, and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.   This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Cummins Inc. ("Cummins" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law. The wrongdoing resulted in $2.04 billion in damages to date and significant damages to Cummins' reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.   Cummins designs, manufactures, distributes, and services diesel, natural gas, electric and hybrid powertrains, and powertrain-related components. This action focuses on the Company's installation of emissions control devices in truck engines, specifically those found in RAM 2500 and 3500 trucks.

3.   The Environmental Protection Agency ("EPA") and state regulatory agencies oversee engine manufacturers because of the potential impact on the environment and public health.  The EPA ensures that companies like Cummins are compliant with the Clean Air Act, 42 U.S.C. 85, *et seq*.[1]   In 1998 and 2010, the

---

[1] The Clean Air Act is the United States' primary federal air quality law, intended to reduce and control air pollution nationwide.  Initially enacted in 1963 and

EPA found that the Company violated the Clean Air Act, causing Cummins to pay millions of dollars in fines and recall vehicles.  In November 2016, consumers brought a class action complaint against Cummins for concealing high levels of emissions in RAM 2500 and 3500 trucks (the "2016 Consumer Class Action").  The 2016 Consumer Class Action is still ongoing.  In 2018, the Company issued a recall for over 500,000 2010-2015 medium and heavy-duty trucks due to excessive nitrogen oxide ("NOx") emissions.  Although the 2018 recall was not for "defeat devices,"[2] 232,000 RAM 2500 and 3500 trucks were part of the 2018 recall and remained equipped with the illegal emissions control devices at issue here.

4.    In April 2019, the EPA and the U.S. Department of Justice ("DOJ") began investigating Cummins again for potential violations of the Clean Air Act.  During that time, the Individual Defendants (as defined herein) touted the Company's commitment to the environment and regulatory compliance.  The Individual Defendants repeatedly assured the public that compliance problems were being addressed and that regulators were satisfied with the Company's operations.

5.    Unfortunately, that was not the case.  On December 22, 2023, it was revealed that the Company had produced engines for the RAM 2500 and 3500 trucks with illegal emissions control devices since 2013.  These devices fooled tests in place to determine the amount of chemicals emitted.

6.    That day, the Company announced it had agreed to pay a $1.675 billion penalty to settle a DOJ investigation into the Company's installations of emission testing defeat devices on approximately one million engines.  U.S. Attorney General

---

amended many times since, it is one of the United States' first and most influential modern environmental laws.

[2] A defeat device is any motor vehicle hardware, software, or design that interferes with or disables emissions controls under real-world driving conditions, even if the vehicle passes formal emissions testing.

Merrick B. Garland described Cummins' fine as "the largest civil penalty [the DOJ has] ever secured under the Clean Air Act, and the second largest environmental penalty ever secured."  Company estimated costs of $2.04 billion to resolve the claims.

7.     In the wake of the December 22, 2023 disclosure, Cummins' stock plunged more than 2.87%, or $7.01 per share, on December 22, 2023, to close at $236.99 per share compared to the previous trading day's closing of $244 per share, erasing $993.6 million in market capitalization.

8.     On January 10, 2024, the DOJ released the details of the settlement. In addition to the $1.675 billion penalty, the Company agreed to $325 million to remedy the violations, including funding pollution mitigation projects, and recalling 600,000 2013-2019 RAM 2500 and 3500 trucks.

9.     On this news, Cummins' stock plunged more than 2.57%, or $6.14 per share, over several days, to close at $233.08 per share on January 17, 2024. Compared to January 10, 2024's closing price of $239.22 per share, the news erased $870.3 million in market capitalization.

10.     Further, as a direct result of this unlawful course of conduct, Cummins is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Central District of California on behalf of investors who purchased Cummins' shares (the "Securities Class Action").  The Company is also the subject of a consumer class action lawsuit filed in the U.S. District Court for the Northern District of California on behalf on consumers who purchased 2013-2023 RAM 2500 and 3500 trucks (the "2023 Consumer Class Action").

## JURISDICTION AND VENUE

11.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Cummins, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) the Securities Class Action is ongoing in this District.

## THE PARTIES

**Plaintiff**

14.     Plaintiff Catherine M. Sugarbaker Family Trust, Michael Mongiello Trustee, U/A DTD 11/08/21 was a stockholder of Cummins at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Cummins stockholder.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant**

15.     Cummins is an Indiana corporation with principal offices 500 Jackson Street Columbus, Indiana.  Accordingly, Cummins is a citizen of Indiana.  Cummins is one of the first diesel engine manufacturers and designs, manufactures, distributes, and services diesel, natural gas, electric, and hybrid powertrains and powertrain-related components, including filtration, after-treatment, turbochargers, fuel systems, controls systems, air handling systems, automated transmissions,

axles, drivelines, brakes, suspension systems, electric power generation systems, batteries, electrified power systems, electric powertrains, hydrogen production technologies, and fuel cell products.   As of December 31, 2022, the Company employed approximately 73,600 persons worldwide, which includes the addition of more than 10,000 employees through acquisitions completed in 2022.

**Defendants**

16.    Jennifer W. Rumsey ("Rumsey") has been Cummins' Chief Executive Officer ("CEO") since August 2022 and Chairman of the Board of Directors (the "Board") since August 2023.  Defendant Rumsey is named as a defendant in one related securities complaint that alleges she violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as SEC Rule 10b-5 promulgated thereunder.  Cummins paid defendant Rumsey the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|--------------------------------------------------------------------------|------------------------|-------|
| 2022 | $1,062,833 | - | $4,478,567 | - | $1,532,908 | - | $59,103 | $7,133,411 |
| 2021 | $716,667 | - | $1,757,020 | -$570,269 | $1,277,983 | $427,832 | $25,829 | $3,635,062 |

Defendant Rumsey is a citizen of Indiana.

17.    Defendant N. Thomas Linebarger ("Linebarger") served as Cummins' Executive Chairman from August 2022 to July 2023 and Chairman from January 2012 to July 2023.  Defendant Linebarger also served as Chief Operating Officer from 2008 to 2011.  Defendant Linebarger is named as a defendant in one related securities complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act, as well as SEC Rule 10b-5 promulgated thereunder.  Cummins paid defendant Linebarger the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| 2022 | $1,397,917 | - | $5,024,835 | - | $4,850,425 | $24,768 | $223,106 | $11,521,051 |
| 2021 | $1,575,000 | - | $6,879,016 | - | $6,225,300 | $465,336 | $501,267 | $15,645,919 |
| 2020 | $1,214,063 | - | $2,567,468 | $2,431,255 | $5,253,600 | $5,456,681 | $368,514 | $17,291,581 |
| 2019 | $1,542,500 | - | $3,226,013 | $3,074,163 | $7,793,200 | $9,405,602 | $75,273 | $25,116,751 |

Defendant Linebarger is a citizen of Indiana.

18. Defendant Mark A. Smith ("Smith") has been Cummins' Chief Financial Officer since March 2019. Defendant Smith is named as a defendant in one related securities complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act, as well as SEC Rule 10b-5 promulgated thereunder. Cummins paid defendant Smith the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| 2022 | $735,000 | - | $1,255,754 | - | $1,251,600 | - | $29,814 | $3,272,168 |
| 2021 | $710,000 | - | $1,529,756 | - | $1,522,150 | $1,237,182 | $28,258 | $5,027,346 |
| 2020 | $628,646 | - | $570,269 | $540,138 | $816,550 | $1,417,088 | $27,407 | $4,000,098 |
| 2019 | $658,333 | - | $705,644 | $672,346 | $801,250 | $1,472,494 | $60,662 | $4,370,729 |

Defendant Smith is a citizen of Indiana.

19. Defendant Robert J. Bernhard ("Bernhard") has been a Cummins director since October 2008. He has been a member of Cummins' Audit Committee since at least April 2019. Cummins paid defendant Bernhard the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2022 | $140,000 | $174,116 | - | - | $314,116 |
| 2021 | $110,677 | $152,249 | $16,775 | $2,400 | $282,101 |
| 2020 | $125,000 | $150,845 | $23,528 | - | $299,373 |
| 2019 | $125,000 | $149,936 | $7,915 | - | $282,851 |

Defendant Bernhard is a citizen of Indiana

20. Defendant Bruno V. Di Leo Allen ("Di Leo") has been a Cummins director since May 2015. Cummins paid defendant Di Leo the following

compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $140,000 | $174,116 | $314,116 |
| 2021 | $110,677 | $152,249 | $262,926 |
| 2020 | $125,000 | $150,845 | $275,845 |
| 2019 | $125,000 | $149,936 | $274,936 |

Defendant Di Leo is a citizen of California.

21.     Defendant Stephen B. Dobbs ("Dobbs") has been a Cummins director since October 2013.  He has been a member of Cummins' Audit Committee since at least April 2019.  Cummins paid defendant Dobbs the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $155,000 | $174,116 | - | $329,116 |
| 2021 | $125,677 | $152,249 | $31,000 | $308,926 |
| 2020 | $140,000 | $150,845 | $26,000 | $316,845 |
| 2019 | $140,000 | $149,936 | $5,000 | $294,936 |

Defendant Dobbs is a citizen of Texas.

22.     Defendant Gary L. Belske ("Belske") has been a Cummins director since July 2022.  He has been Chairman of Cummins' Audit Committee since at least May 2023.  Cummins paid defendant Belske the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $128,333 | $163,939 | $16,500 | $308,772 |

Defendant Belske is a citizen of Texas.

23.     Defendant Carla A. Harris ("Harris") has been a Cummins director since May 2021.  Cummins paid defendant Harris the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $140,000 | $174,116 | - | $314,116 |
| 2021 | $110,677 | $152,249 | $5,000 | $267,926 |

Defendant Harris is a citizen of New Jersey.

24.   Defendant Thomas J. Lynch ("Lynch") has been a Cummins director since May 2015.  Cummins paid defendant Lynch the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $205,000 | $174,116 | - | $379,116 |
| 2021 | $125,677 | $152,249 | - | $277,926 |
| 2020 | $140,000 | $150,845 | $50,000 | $340,845 |
| 2019 | $140,000 | $149,936 | - | $289,936 |

Defendant Lynch is a citizen of New York.

25.   Defendant William I. Miller ("Miller") has been a Cummins director since 1989.  He has been a member of Cummins' Audit Committee since at least April 2019.   Cummins paid defendant Miller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | Total |
|---|---|---|---|---|
| 2022 | $140,000 | $174,116 | $39,236 | $353,352 |
| 2021 | $110,677 | $152,249 | $73,748 | $336,674 |
| 2020 | $125,000 | $150,845 | $74,630 | $350,475 |
| 2019 | $125,000 | $149,936 | $76,646 | $351,582 |

Defendant Miller is a citizen of New York.

26.   Defendant Georgia R. Nelson ("G. Nelson") has been a Cummins director since July 2004.  She has been a member of Cummins' Audit Committee since at least April 2019.   Cummins paid defendant G. Nelson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | Total |
|---|---|---|---|---|
| 2022 | $165,000 | $174,116 | $4,576 | $343,692 |
| 2021 | $130,677 | $152,249 | $13,423 | $296,349 |
| 2020 | $145,000 | $150,845 | $14,185 | $310,030 |
| 2019 | $145,000 | $149,936 | $15,395 | $310,331 |

Defendant G. Nelson is a citizen of Colorado.

27. Defendant Kimberly A. Nelson ("K. Nelson") has been a Cummins director since October 2020. She has been a member of Cummins' Audit Committee since at least April 2021. Cummins paid defendant K. Nelson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $140,000 | $174,116 | $50,000 | $364,116 |
| 2021 | $110,677 | $152,249 | $50,000 | $312,926 |
| 2020 | $83,333 | $103,832 | $50,000 | $237,165 |

Defendant K. Nelson is a citizen of Minnesota.

28. Defendant Karen H. Quintos ("Quintos") has been a Cummins director since July 2017. She has been a member of Cummins' Audit Committee since at least April 2019. Cummins paid defendant Quintos the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | Total |
|---|---|---|---|---|
| 2022 | $140,000 | $174,116 | - | $314,116 |
| 2021 | $110,677 | $152,249 | $95,936 | $358,862 |
| 2020 | $125,000 | $150,845 | $43,393 | $319,238 |
| 2019 | $125,000 | $149,936 | $35,444 | $310,380 |

Defendant Quintos is a citizen of Texas.

29. Defendant Franklin R. Chang Diaz ("Chang Diaz") served as a Cummins director from May 2009 to November 2022. Cummins paid defendant Chang Diaz the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $140,000 | $174,116 | $314,116 |
| 2021 | $110,677 | $152,249 | $262,926 |
| 2020 | $125,000 | $150,845 | $275,845 |
| 2019 | $125,000 | $149,936 | $274,936 |

Defendant Quintos is a citizen of Texas.

30.    Defendant Alexis M. Herman ("Herman") served as a Cummins director from 2001 to May 2022.  Cummins paid defendant Herman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | Total |
|---|---|---|---|---|
| 2022 | - | - | - | - |
| 2021 | $160,677 | $152,249 | - | $312,926 |
| 2020 | $175,000 | $150,845 | $76,657 | $402,502 |
| 2019 | $175,000 | $149,936 | $68,838 | $393,774 |

Defendant Herman is a citizen of Virginia.

31.    Defendant Robert K. Herdman ("Herdman") served as a Cummins director from February 2008 until May 2023.  Defendant Herdman served as a member of Cummins' Audit Committee from at least April 2019 until May 2023. Cummins paid defendant Herdman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $165,000 | $174,116 | $31,500 | $370,616 |
| 2021 | $130,677 | $152,249 | $21,500 | $304,426 |
| 2020 | $145,000 | $150,845 | $1,000 | $296,845 |
| 2019 | $145,000 | $149,936 | $1,000 | $295,936 |

Defendant Herdman is a citizen of Florida.

**Current Director Non-Defendant**

32.    Daniel W. Fisher ("Fisher") has been a Cummins director since October 2023.

33.    The defendants identified in ¶¶16-18 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶16-17, 19-31 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶19, 21-22, 25-31 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶16-31 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

34.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Cummins and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Cummins in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Cummins and not in furtherance of their personal interest or benefit.

35.    To discharge their duties, the officers and directors of Cummins were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Cummins were required to, among other things:

(a)    disclose material adverse information concerning the true nature of the Company's engine production issues along with how those issues materially and negatively affected the Company's ability to comply with the law;

(b)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)    remain informed as to how Cummins conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

36.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Cummins, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

37.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in producing engines with emission control devices that violated state and federal law and making materially false and misleading statements, improper practices that wasted the Company's assets, and caused Cummins to incur substantial damage.

38.     The Individual Defendants, because of their positions of control and authority as officers or directors of Cummins, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.   As a result, and in addition to the damage the Company has already incurred, Cummins has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

39.     In addition to these duties, under its Charter in effect since February 5, 2021, the Audit Committee Defendants, defendants Bernhard, Dobbs, Belske, Miller, G. Nelson, K. Nelson, Quintos, and Herdman, owe and owed specific duties to Cummins to assist the Board in overseeing compliance and risk.   Moreover the Audit Committee's Charter provides that the Audit Committee Defendants oversee compliance, stating:

> The Committee shall receive and review corporate attorneys' reports of
> evidence of a material violation of any law, rule or regulation (including

- 12 -

securities laws or breaches of fiduciary duty) or the Company's Code of Conduct regarding the Company's financial statements, internal control over financial reporting and accounting or compliance policies. The Committee shall have general oversight responsibility for the Company's business ethics and Code of Business Conduct programs. In discharging its oversight role, the Committee is empowered to investigate any matter within the scope of its responsibility, with full access to all books, records, facilities and personnel of the Company.

40.      According to the Audit Committee Charter, the Audit Committee Defendants are and were required to review the Company's financial statements and internal controls to protect against significant deficiencies in disclosures.   In particular, the Audit Committee Charter states:

B. Oversight of Financial Disclosure and Internal Controls

1. The Committee will review and discuss with management, the chief audit executive and the independent auditor, as appropriate:

(a) the Company's annual audited financial statements and quarterly unaudited financial statements, as well as management's discussion and analysis of financial condition and results of operations, the results of each quarterly review and annual audit by the independent auditor, and other matters required to be discussed with the independent auditor by applicable laws, regulations and auditing standards, including the quality, not just the acceptability, of the accounting principles and underlying estimates used in the audited financial statements. The Committee also will review and discuss each Form 10-Q and Form 10-K with the Chief Executive Officer, the Chief Financial Officer and the General Counsel, prior to filing. The Committee will report to the Board and shareholders whether it

recommends to the Board that the most recent year's audited financial statements be included in the Form 10-K;

(b) any other SEC filings as the Committee deems appropriate, prior to filing;

\*        \*        \*

(aa) significant deficiencies in the design or operation of internal controls or any material weaknesses therein[.]

41.    The Audit Committee is and was also required to review material litigation and reports from regulators.  In particular, the Audit Committee Charter, states:

7.  The Committee shall review and discuss with the Company's General Counsel and chief audit executive:

(a) material litigation involving the Company that has a material impact on the financial statements;

(b) Any reports or inquiries received from regulators, governmental agencies, employees or others that raise material issues regarding the Company's financial statements, internal control over financial reporting and accounting or compliance policies;

(c) the management delegation of authority process; and

(d) such other matters as the Board or the Committee considers appropriate.

42.    The Audit Committee Defendants failed to ensure the Company was in compliance with the Clean Air Act and California state law.  The Audit Committee Defendants either knew or should have known that the Company was producing engines with unlawful emission control devices.  As a result of the undisclosed issues, the Audit Committee Defendants knew or should have known

that the Company's statements concerning the engines were materially false and misleading.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

43.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

44.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Cummins, regarding the Individual Defendants' management of Cummins' operations and failure to disclose adverse, material nonpublic information concerning the production of engines with illegal emissions control devices; and (ii) enhance the Individual Defendants' executive and directorial positions at Cummins and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

45.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment; and to conceal adverse information concerning the Company's illegal emissions control devices.

46.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully

- 15 -

or recklessly produce engines with illegal emissions control devices and make materially false and misleading statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

47.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## **FACTUAL BACKGROUND**

**Cummins Supplies Engines for the RAM 2500 and 3500 Trucks**

48.    The Cummins Engine Company was founded in Columbus, Indiana, on February 3, 1919.  The Company went public in 1947 and develops engines, among other products.

49.    Cummins designs, manufactures, distributes and services engines.  The Company sells its products to original equipment manufacturers ("OEMs"), distributors, dealers, and other customers worldwide.  Cummins services its customers through a service network of approximately 500 wholly-owned, joint venture and independent distributor locations and more than 10,000 Cummins certified dealer locations in approximately 190 countries and territories.

50.    The Company is organized into five operating segments, including the engine segment.  The engine segment manufactures and markets a broad range of diesel and natural gas-powered engines under the Cummins brand name, as well as certain customer brand names, for the heavy and medium-duty truck, bus,

recreational vehicle ("RV"), light-duty automotive, construction, mining, marine, rail, oil and gas, defense, and agricultural markets.

51.     The Company has thousands of customers around the world.  One of Cummins' largest customers is Stellantis N.V. ("Stellantis").   The Company supplies Stellantis with engines for its RAM trucks, including the RAM 2500 and 3500 trucks.

**The Clean Air Act**

52.     Motor vehicles must satisfy emission standards for certain air pollutants, including emission standards for NOx.  *See, e.g.*, 40 C.F.R. §§86.1811-04, 86.1811-09, 86.1811-10, and 86.1818-12.  The EPA uses a series of tests to measure tailpipe emissions, including NOx, from vehicles in a "test group" in order to demonstrate compliance with emissions standards.

53.     The EPA administers a certification program to ensure that every new motor vehicle introduced into United States commerce satisfies applicable emission standards.  42 U.S.C. §7521.  Under this program, the EPA issues Certificates of Conformity ("COCs") and thereby regulates the introduction of new motor vehicles into United States commerce.  To obtain a COC, a manufacturer must submit an application to EPA for each model year and for each test group of new motor vehicles that it intends to enter into United States commerce.  40 C.F.R. §86.1843-01.  Each COC application must include, among other things, a list of all auxiliary emission control devices ("AECDs") installed on the motor vehicles, as well as a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and a rationale for why it is not a defeat device.  40 C.F.R. §86.1844-01(d)(11).

54.     The Code of Federal Regulations defines AECD as "any element of design which senses temperature, vehicle speed, engine [revolutions per minute],

transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."  40 C.F.R. §86.1803-01.  An element of design is "any control system (i.e., computer software, electronic control system, emission control system, computer logic), and/or control system calibrations, and/or the results of systems interaction, and/or hardware items on a motor vehicle or motor vehicle engine." 40 C.F.R. §86.1803-01.  Therefore, any new motor vehicle containing an AECD that is not disclosed in the COC application does not conform in all material respects with the COC application and, therefore, is not covered by the COC.

55.    The Clean Air Act prohibits "defeat devices."  A "defeat device" is an AECD that:

> [R]educes the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless: (1) Such conditions are substantially included in the Federal emission test procedure; (2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; (3) The AECD does not go beyond the requirements of engine starting; or (4) The AECD applies only for emergency vehicles....

40 C.F.R. §86.1803-01.

**The Company's History of Violating the Clean Air Act**

56.    Cummins unfortunately has a long history of violating the Clean Air Act.  In 1998, the EPA revealed that Cummins and certain other diesel engine manufacturers were evading testing requirements by deliberately deactivating emissions controls during highway driving.  Cummins' manipulations gave the appearance of being in full regulatory compliance during standard laboratory testing but, by disabling the emissions controls during normal highway cruising, Cummins

- 18 -

1  and the other manufacturers were able to hide that their engines emitted up to three
2  times the maximum allowed NOx pollution.  The EPA fined Cummins and the other
3  manufacturers $83.4 million and the manufacturers agreed to spend more than $1
4  billion to correct the problem.

5  57.  In conjunction with the 1998 Clean Air Act violations, Cummins
6  entered into a Consent Decree forbidding future violations (the "Consent Decree").
7  Unfortunately, Cummins violated the Consent Decree by continuing to use defeat
8  devices and auxiliary emission control devices in the years that followed.   In
9  September 2006, Cummins entered into the Agreement Regarding Alleged Non-
10  Compliance with Consent Decree for violating the Consent Decree ("Consent
11  Decree Violation 1 Agreement").   The Consent Decree Violation 1 Agreement
12  stated that the Company installed illegal auxiliary emission control devices in
13  11,600 engines, which resulted in excess emissions of 979 tons of NOx.  The EPA
14  fined the Company $950,000 and Cummins undertook remedial measures.

15  58.  In October 2006, the Company conceded that it again violated the
16  Consent Decree resulting in a $2.1 million fine.  In November 2010, Cummins
17  violated the Consent Decree again, resulting in $375,000 in penalties.

18  59.  In February 2010, Cummins agreed to a $2.1 million penalty and a
19  recall of 405 engines to resolve Clean Air Act violations.  According to the EPA,
20  between 1998 and 2006, Cummins shipped more than 570,000 heavy duty diesel
21  engines to vehicle equipment manufacturers nationwide without pollution control
22  equipment included, in violation of the Clean Air Act.  This equipment, known as
23  exhaust after-treatment devices ("ATDs"), controls engine exhaust emissions once
24  the emissions have exited the engine and entered the exhaust system.  Typical ATDs
25  include catalytic converters and diesel particulate filters.   Based on the same

26
27
28

wrongdoing, the Company paid $420,000 of the civil penalty under a separate settlement agreement to the California Air Resources Board ("CARB").[3]

60.     The 2016 Consumer Class Action focuses on defeat devices installed in the RAM 2500 and 3500 trucks, model years 2007-2012, that fooled emissions tests.  Cummins advertised that the trucks were designed to simultaneously provide power and lower emissions.  However, plaintiffs in the 2016 Consumer Class Action did emissions testing using accepted testing equipment and protocols conducted by experts in emissions testing and demonstrated that the vehicles emit far more pollution on the road than in the emissions-certification testing environment.  The stark difference in emission levels between a testing environment and real-world environment is a classic indicator that the vehicles had defeat devices.  One test revealed that the 2007 model released 7.4 times the legal limit allowed for NOx.  Similar results were found in testing for the 2009 and 2012 vehicles.  For the 2012 model, average emissions of NOx were found to be thirty-six times the standard.  The Company also failed to disclose that the defeat devices impaired fuel economy and, thus, increased fuel costs for consumers.  The 2016 Consumer Class Action is ongoing.

61.     In 2018, the Company issued a recall for over 500,000 2010-2015 medium and heavy-duty trucks due to excessive NOx emissions.  232,000 RAM 2500 and 3500 trucks were included in the recall.  The reason for the recall did not have to do with emissions control devices.  CARB specifically stated that "the cause of the excess emissions [in the earlier recall] was purely mechanical—the faster-than-expected degradation of the catalyst—and not the product of a 'defeat device' or cheating on tests."  However, even after the 2018 recall, the 232,000 RAM 2500 and 3500 trucks remained equipped with the illegal emissions control devices.

---

[3] CARB is an agency of the state of California that aims to reduce air pollution.

62.     The Company's fiduciaries are also aware of regulatory intervention against peer companies.  In 2017, Volkswagen reached a $4.3 billion agreement with the DOJ, which covered criminal and civil charges stemming from the Dieselgate[4] scandal.  A judge approved that agreement in April 2017.  In 2015, German automaker disclosed that it had cheated emissions tests by installing defeat devices in eleven million vehicles worldwide, using sophisticated software to reduce emissions only during emissions tests.  Volkswagen also agreed to a $15 billion settlement to end civil class action claims.

63.     In August 2022, the U.S. business of Fiat Chrysler Automobiles, now a unit of Stellantis, pleaded guilty to criminal conspiracy and paid nearly $300 million to resolve a multiyear DOJ diesel-emissions fraud probe.  Accordingly, the Individual Defendants are well aware of the risks of violating the Clean Air Act.

## THE EPA AND CARB FINE CUMMINS AFTER A MULTIYEAR INVESTIGATION

64.     On April 29, 2019, Cummins issued a press release titled "Cummins Reviewing Emissions Certification and Compliance Process for its Pickup Truck Applications."  The press release announced that the Company "is formally reviewing its emissions certification and compliance process for its pickup truck applications."  The press release further stated that the review followed "conversations" with EPA and CARB:

> Following conversations with the U.S. EPA and CARB regarding certification for the engines in the 2019 RAM 2500 and 3500 trucks, the company made the decision to review its certification process and compliance with emissions standards. This review is being conducted

---

[4] The "Dieselgate" scandal, also known as "Emissionsgate," refers to a widespread controversy surrounding the illegal use of software in certain diesel vehicles manufactured by Volkswagen Group (VW) that allowed them to emit more harmful pollutants than legally allowed.

with external advisors to ensure the certification process for Cummins pickup truck applications is consistent with its internal policies, engineering standards and applicable laws. Cummins has voluntarily disclosed the review to our regulators and other agencies and will cooperate with them to ensure a complete and thorough review and implement recommendations for improvement.

65.    Several years later, on December 22, 2023, before the market opened, the Company announced an agreement with the EPA and CARB to settle civil claims regarding the use of unlawful emissions control devices in 2013-2019 RAM 2500 and 3500 truck engines.  The Company installed defeat devices in 630,000 2013-2019 RAM 2500 and 3500 truck engines.  The Company also installed undisclosed auxiliary emission control devices in 330,000 2019-2023 RAM 2500 and 3500 truck engines.  Cummins agreed to a penalty of $1.675 billion and expected to record a charge of $2.04 billion in fourth quarter of 2023 to resolve the claims.

66.    According to Attorney General Merrick B. Garland, the settlement with Cummins includes "the largest civil penalty we have ever secured under the Clean Air Act, and the second largest environmental penalty ever secured."

67.    On January 10, 2024, the DOJ revealed that the Company agreed to spend more than $325 million to remedy the violations, including funding mitigation programs to reduce NOx emissions.  Cummins also agreed to a nationwide vehicle recall to repair and replace the engine control software in more than 600,000 RAM 2500 and RAM 3500 pickup trucks equipped with the Company's diesel engines.  Cummins further agreed to extend the warranty period for certain parts in the repaired vehicles, fund and perform projects to mitigate excess ozone-creating NOx emitted from the vehicles and employ new internal procedures designed to prevent future emissions cheating.  That same day, the EPA

and CARB filed corresponding consent decrees and a related set of complaints which detail the Company's illegal activity.

68.     Between 2013 and 2023, the Company violated the Clean Air Act through its production and sale of diesel motor vehicle engines—along with associated engine control and emission control systems—that were installed in nearly one million pickup trucks sold in the United States under the 2013-2023 RAM 2500 and RAM 3500 model names (the "Subject Vehicles").  Cummins' applications for EPA COC for the Subject Vehicles did not disclose multiple software-based features that affect the Subject Vehicles' emission control system.

69.     Cummins' engine software features bypass, defeat, or render inoperative emission control systems in more than 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks, causing those vehicles to emit substantially higher levels of NOx during certain normal real-world driving conditions, as compared to the vehicles' NOx emissions levels during federal emission tests.  That feature was not disclosed in the COC applications for the 2013-2019 RAM 2500 and 3500 models.

70.     The 2013-2019 RAMs and the 2019-2023 RAMs also contained certain other AECDs that were not disclosed in the COC applications for those vehicles.  These AECDs were installed in more than 330,000 2019-2023 RAMs. Each Subject Vehicle contains one or more AECDs that were not disclosed in the application for the COC that purportedly covers each Subject Vehicle.  As a result of the wrongdoing, the Company now has to pay a $1.675 billion penalty and $325 million in remediation.

## IMPROPER STATEMENTS

71.     From April 30, 2019 through December 21, 2023, the Individual Defendants either made or caused the Company to make materially false and misleading statements concerning Cummins' Subject Vehicles engines.

Specifically, the Individual Defendants failed to disclose that the Company was producing and selling engines with unlawful emissions control devices.

72.     On April 30, 2019, Cummins filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2019 (the "Q1 2019 Form 10-Q ").  The Q1 2019 Form 10-Q contained risks disclosures regarding the review of noncompliance issues and how the findings "could" have a materially adverse impact on the Company's financial condition and cash flows:

> ***We are conducting a formal review of our emissions certification process and compliance with emissions standards with respect to our pick-up truck applications.  The results of this formal review or the discovery of any noncompliance issues, could have a materially adverse impact on our results of operations, financial condition and cash flows.***

> We previously announced that we are conducting a formal review of our emissions certification process and compliance with emissions standards with respect to our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks.  While we have voluntarily disclosed our formal review to our regulators and other agencies, we have not been issued any official notice from regulators regarding potential noncompliance issues with these particular engines. ***We plan to work together closely with the relevant regulators to develop a resolution for these matters and we will implement recommendations for improvement as part of our ongoing commitment to compliance.  At this time, we have not yet determined***

***the impact, if any, to other model years or engines or the percentage
of the engine populations that could be affected***.

Due to the preliminary nature of the formal review and the presence of
many unknown facts and circumstances, we are not yet able to estimate
the financial impact of these matters. It is possible that the
consequences of remediation plans resulting from our formal review
could have a materially adverse impact on our results of operations,
financial condition and cash flows in the periods in which these
emission certification issues are addressed.

73.    The Q1 2019 Form 10-Q disclosed the formal review with the EPA
and CARB, and claimed that the Company could not predict the outcome of the
review despite continuing to make engines with unlawful emission control devices,
In particular, the Q1 2019 Form 10-Q stated:

On April 29, 2019, we announced that we are conducting a formal
review of our emissions certification process and compliance with
emissions standards for our pick-up truck applications, following
conversations with the U.S. Environmental Protection Agency (EPA)
and California Air Resources Board (CARB) regarding certification for
our engines ***in model year 2019 RAM 2500 and 3500 trucks***. In
addition, we announced that we have voluntarily disclosed our formal
review to our regulators and other agencies and will work cooperatively
to ensure a complete and thorough review. ***Due to the preliminary
nature of our formal review and the presence of many unknown facts
and circumstances, we cannot predict the outcome and we cannot
provide assurance that the matter will not have a materially adverse***

*impact on our results of operations, financial condition and cash flows.*

74.     On July 30, 2019 and October 29, 2019, Cummins filed with the SEC its Quarterly Reports on Forms 10-Q for the second quarter ended June 30, 2019 (the "Q2 2019 Form 10-Q") and third quarter ended September 29, 2019 (the "Q3 2019 Form 10-Q"), respectively.  The Q2 2019 Form 10-Q and Q3 2019 Form 10-Q contained substantially similar disclosures as those in the Q1 2019 Form 10-Q regarding the EPA's and CARB's ongoing investigations.

75.     On February 11, 2020, Cummins filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2019 (the "2019 Form 10-K").  The 2019 Form 10-K contained risk disclosures concerning the EPA and CARB reviews that failed to disclose that Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful emission control devices.  In particular, the 2019 Form 10-K stated:

*We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pickup truck applications and working with the EPA and CARB, as well as the Department of Justice (DOJ) and SEC, to address their questions about these applications.  The results of this formal review and regulatory and government agency processes, or the discovery of any noncompliance issues, could have a material adverse impact on our results of operations and cash flows.*

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, *following conversations with the EPA and CARB regarding*

***certification of our engines for model year 2019 RAM 2500 and 3500 trucks***.  During conversations with the EPA and CARB about the effectiveness of our pickup truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.  As a result, our internal review focuses, in part, on the regulators' concerns.  We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements.  Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019.  During our discussions, the regulators have asked us to look at other model years and other engines, though the primary focus of our review has been the model year 2019 RAM.  ***We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance.  We are also fully cooperating with the DOJ's and the SEC's information requests and inquiries***.

Due to the continuing nature of the formal review, our ongoing cooperation with the regulators and other government agencies, and the presence of many unknown facts and circumstances, we are not yet able to estimate the financial impact of these matters.  It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory and agency processes could have a material

adverse impact on our results of operations and cash flows in the periods in which these emissions certification issues are addressed.

76.    The 2019 Form 10-K also contained risk disclosures concerning the Company's regulatory environment, but failed to disclose that the production of engines with unlawful emissions control devices would raise the risk of regulatory enforcement and penalties.  In particular, the 2019 Form 10-K stated:

*Our products are subject to extensive statutory and regulatory requirements that can significantly increase our costs and, along with increased scrutiny from regulatory agencies and unpredictability in the adoption, implementation and enforcement of increasingly stringent emission standards by multiple jurisdictions around the world, could have a material adverse impact on our results of operations, financial condition and cash flows.*

Our engines are subject to extensive statutory and regulatory requirements governing emissions and noise, including standards imposed by the EPA, the EU, state regulatory agencies (such as the CARB) and other regulatory agencies around the world. Regulatory agencies are making certification and compliance with emissions and noise standards more stringent and subjecting diesel engine products to an increasing level of scrutiny.  *The discovery of noncompliance issues could have a material adverse impact on our results of operations, financial condition and cash flows*.

Developing engines and components to meet more stringent and changing regulatory requirements, with different implementation timelines and emission requirements, makes developing engines

efficiently for multiple markets complicated and could result in substantial additional costs that may be difficult to recover in certain markets. ***While we have met previous deadlines, our ability to comply with existing and future regulatory standards will be essential for us to maintain our competitive advantage in the engine markets we serve. The successful development and introduction of new and enhanced products in order to comply with new regulatory requirements are subject to other risks, such as delays in product development, cost over-runs and unanticipated technical and manufacturing difficulties.***

***In addition to these risks, the nature and timing of government implementation and enforcement of increasingly stringent emission*** standards ***in our worldwide markets are unpredictable and subject to change. Any delays in implementation or enforcement could result in a loss of our competitive advantage and could have a material adverse impact on our results of operations, financial condition and cash flows.***

77.    The 2019 Form 10-K also contained disclosures that overstated the Company's commitment to environmental sustainability, stating:

We adopted our comprehensive environmental sustainability plan in 2014 after examining our entire environmental footprint, focusing on the key areas of water, waste, energy and greenhouse gases (GHG). As the concept and scope of environmental sustainability has matured and broadened, leaders have moved from initially working on environmental impacts within our direct control in our operations to an expanded view of fuel and raw materials that reaches across the entire

product life-cycle from design to manufacture to end of life. ***Our environmental sustainability plan is the way we carry out our priorities, goals and initiatives in our action areas, including reducing our carbon footprint, using fewer natural resources and partnering to solve complex problems***.

The highest level of accountability for Cummins' climate-related risks and opportunities is with the Safety, Environment and Technology (SET) committee of the Board of Directors (the Board).  The Action Committee for Environmental Sustainability meets monthly and reports to the Chairman and to the SET committee at least annually.

Our Sustainability Progress Report for 2018/2019 includes goal progress and other key environmental and climate metrics and targets. This and prior reports as well as a Data Book of more detailed environmental data in accordance with the Global Reporting Initiative's Standard core compliance designation are available on our website at www.cummins.com.  Our annual submission to the Carbon Disclosure Project (CDP) for climate change and water are also available on the website.  The climate submission provides information on our scenario planning exercise for climate and other risks as requested by CDP. These reports and data book are not incorporated into this Form 10-K by reference.   We currently report on the following environmental sustainability goals and commitments from our 2014 plan:

- a product vision statement — "powering the future through product innovation that makes people's lives better and reduces our environmental footprint;"

- partnering with customers to improve the fuel efficiency of our products in use, ***targeting an annual run-rate reduction of 3.5 million metric tons of carbon dioxide***;
- achieving a 32 percent energy intensity reduction from company facilities by the end of 2020 (using a baseline year of 2010) and increasing the portion of electricity we use derived from renewable sources;
- reducing direct water use by 50 percent adjusted for hours worked and achieving water neutrality at 15 sites by the end of 2020;
- increasing our recycling rate from 88 percent to 95 percent and achieving zero disposal at 30 sites by the end of 2020; and
- utilizing the most efficient methods and modes to move goods across our network to reduce carbon dioxide per kilogram of goods moved by 10 percent by the end of 2020.

We continue to articulate our positions on key public policy issues and on a wide range of environmental issues.  We are actively engaged with regulatory, industry and other stakeholder groups around the world as GHG and fuel efficiency standards become more prevalent globally. We were named number 17 in Newsweek's 2019 Green Ranking of U.S. companies, number 14 among Barron's Top 100 Most Sustainable Companies as well as named to the Dow Jones North American Sustainability Index for the fourteenth consecutive year in 2019.

***In late 2019, Cummins introduced PLANET 2050, a sustainability strategy focused on three priority areas: addressing climate change***

***and air emissions, using natural resources in the most sustainable way and improving communities***. It includes eight specific goals to achieve by 2030, as well as aspirational targets for 2050. Cummins is currently evaluating how the new goals will be integrated into business planning and will report on progress beginning in 2022.

78.     The 2019 Form 10-K contained disclosures that overstated Cummins' commitment to environmental compliance, stating:

> Our engines are subject to extensive statutory and regulatory requirements that directly or indirectly impose standards governing emission and noise. Over the past several years we have substantially increased our global environmental compliance presence and expertise to understand and meet emerging product environmental regulations around the world. Our ability to comply with these and future emission standards is an essential element in maintaining our leadership position in regulated markets. We have made, and will continue to make, significant capital and research expenditures to comply with these standards.
>
> Following conversations with the U.S. Environmental Protection Agency (EPA) and California Air Resources Board (CARB) regarding certification for the engines in the 2019 RAM 2500 and 3500 trucks, we made the decision to review our certification process and compliance with emission standards. This review is being conducted with external advisers to ensure the certification and all of our processes for our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. In addition, we voluntarily disclosed our formal internal review to our regulators and

other agencies and have been working cooperatively with them to ensure a complete and thorough review.

***We strive to be a leader in developing and implementing technologies that provide customers with the highest performing products that also have the least impact on the environment and have a long history of working with governments and regulators to achieve these goals***. We remain committed to ensuring that our products meet all current and future emission standards and delivering value to our customers.

On October 17, 2019, the Board approved the creation of a new Product Compliance and Regulatory Affairs Organization to lead engine emission certification and compliance and regulatory affairs. This new organization is led by the Vice President - Product Compliance and Regulatory Affairs who reports directly to the Chief Executive Officer, and the new Vice President joins the Cummins Executive ***Team*** and Cummins Leadership Team. The focus of this new organization will be to strengthen our ability to design great products that help our customers win while ensuring compliance with increasingly challenging global emission regulations. The organization will also work to enhance our collaboration with the agencies that set the direction and regulations of emissions to best ensure we are meeting every expectation today while planning ahead for future changes.

79.     The 2019 Form 10-K falsely claimed that the Company could not predict the final outcome of the EPA and CARB reviews while continuing to produce engines with unlawful emission control devices, raising the likelihood of an adverse impact and a stringent penalty. In particular, the 2019 Form 10-K stated:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the EPA and the CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks.  This review is being conducted with external advisors to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws.  ***In addition, we voluntarily disclosed our formal internal review to our regulators and to other government agencies, the DOJ and the SEC, and have been working cooperatively with them to ensure a complete and thorough review.***  During conversations with the EPA and CARB about the effectiveness of our pickup truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.  As a result, our internal review focuses, in part, on the regulators' concerns.  We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements.  ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019***.  During our discussions, the regulators have asked us to look at other model years and other engines, though the primary focus of our review has been the model year 2019 RAM.  ***We are also fully cooperating with the DOJ's and the SEC's information requests and***

***inquiries***.   Due to the continuing nature of our formal review, our ongoing cooperation with our regulators and other government agencies, and the presence of many unknown facts and circumstances, ***we cannot predict the final outcome of this review and these regulatory and agency processes, and we cannot provide assurance that the matter will not have a materially adverse impact on our results of operations and cash flows***.

80.     On April 28, 2020, July 28, 2020, and October 27, 2020, the Company filed with the SEC its Quarterly Reports on Forms 10-Q for the first quarter ended March 29, 2020 (the "Q1 2020 Form 10-Q"), the second quarter ended June 28, 2020 (the "Q2 2020 Form 10-Q"), and third quarter ended September 27, 2020 (the "Q3 2020 Form 10-Q"), respectively.  The Q1 2020 Form 10-Q, Q2 202 Form 10-Q, and Q3 2020 Form 10-Q each contained risk disclosures regarding the EPA and CARB reviews, but failed to disclose that the Company was still producing engines with unlawful emission control devices.  In particular, the Forms 10-Q stated:

***We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pickup truck applications and working with the EPA and CARB, as well as the Department of Justice (DOJ) and SEC, to address their questions about these applications.  The results of this formal review and regulatory and government agency processes, or the discovery of any noncompliance issues, could have a material adverse impact on our results of operations and cash flows.***

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications,

- 35 -

following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. ***During conversations with the EPA and CARB about the effectiveness of our pickup truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices***. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. ***During our discussions, the regulators have asked us to look at other model years and other engines, though the primary focus of our review has been the model year 2019 RAM. We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance***. We are also fully cooperating with the DOJ's and the SEC's information requests and inquiries.

Due to the continuing nature of the formal review, our ongoing cooperation with the regulators and other government agencies, and the presence of many unknown facts and circumstances, we are not yet able to estimate the financial impact of these matters. It is possible that the consequences of any remediation plans resulting from our formal

review and these regulatory and agency processes could have a material adverse impact on our results of operations and cash flows in the periods in which these emissions certification issues are addressed.

81.     On February 10, 2021, Cummins filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K").  The 2020 Form 10-K's risks disclosures continued to fail to disclose that the Company was still producing engines with unlawful emission control devices, stating:

> **We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pickup truck applications and are working with the EPA and CARB to address their questions about these applications. The results of this formal review and regulatory processes, or the discovery of any noncompliance issues, could have a material adverse impact on our results of operations and cash flows.**

> We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, **following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks**.  **During conversations with the EPA and CARB about the effectiveness of our pickup truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.  As a result, our internal review focuses, in part, on the regulators' concerns.  We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all**

*of our pick-up truck applications and to fully address the regulators'
requirements.   Based on discussions with the regulators, we have
developed a new calibration for the engines in model year 2019 RAM
2500 and 3500 trucks that has been included in all engines shipped
since September 2019.  During our discussions, the regulators have
asked us to look at other model years and other engines.  We will
continue to work together closely with the relevant regulators to
develop and implement recommendations for improvement as part of
our ongoing commitment to compliance.*

82.    The 2020 Form 10-K also contained risk disclosures concerning the
Company's regulatory environment, but failed to disclose that the production of
engines with unlawful emissions control devices would raise the risk of regulatory
enforcement and penalties.  In particular, the 2020 Form 10-K stated:

*Our products are subject to extensive statutory and regulatory
requirements that can significantly increase our costs and, along with
increased scrutiny from regulatory agencies and unpredictability in
the adoption, implementation and enforcement of increasingly
stringent and fragmented emission standards by multiple
jurisdictions around the world, could have a material adverse impact
on our results of operations, financial condition and cash flows.*

Our engines are subject to extensive statutory and regulatory
requirements governing emissions and noise, including standards
imposed by the EPA, the EU, state regulatory agencies (such as the
CARB) and other regulatory agencies around the world.  *Regulatory
agencies are making certification and compliance with emissions and
noise standards more stringent and subjecting diesel engine products*

*to an increasing level of scrutiny.  The discovery of noncompliance issues could have a material adverse impact on our results of operations, financial condition and cash flows*.

Developing engines and components to meet more stringent and changing regulatory requirements, with different implementation timelines and emission requirements, makes developing engines efficiently for multiple markets complicated and could result in substantial additional costs that may be difficult to recover in certain markets.  While we have met previous deadlines, our ability to comply with existing and future regulatory standards will be essential for us to maintain our competitive position in the engine applications and industries we serve.  The successful development and introduction of new and enhanced products in order to comply with new regulatory requirements are subject to other risks, such as delays in product development, cost over-runs and unanticipated technical and manufacturing difficulties.

In addition to these risks, the nature and timing of government implementation and enforcement of increasingly stringent emission standards in our worldwide markets are unpredictable and subject to change.  Any delays in implementation or enforcement could result in a loss of our competitive advantage and could have a material adverse impact on our results of operations, financial condition and cash flows.

83.     The 2020 Form 10-K also contained disclosures that overstated the Company's commitment to environmental sustainability, stating:

We are committed to making people's lives better by powering a more prosperous world.  That prosperity includes strong communities, robust business and environmental sustainability.

The highest level of accountability for our climate-related risks and opportunities is with the Safety, Environment and Technology (SET) Committee of the Board of Directors (the Board).    The Action Committee for Environmental Sustainability meets monthly and reports to the Chairman and to the SET Committee at least annually.

***In late 2019, we introduced PLANET 2050, a sustainability strategy focused on three priority areas: addressing climate change and air emissions, using natural resources in the most sustainable way and improving communities***.  The strategy includes eight specific goals to achieve by 2030, including science-based carbon dioxide reduction targets for newly sold products and facilities, as well as aspirational targets for 2050.  We are currently evaluating how the new goals will be integrated into business planning and will report on progress beginning in 2022.

Our Sustainability Progress Report for 2019/2020 reports on environmental sustainability goals and commitments from our 2014 plan as well as other key environmental and climate metrics and targets. The 2014 plan goals were as follows:

- ***partnering with customers to improve the fuel efficiency of our products in use, targeting an annual run-rate reduction of 3.5 million metric tons of carbon dioxide***;

- achieving a 32 percent energy intensity reduction from company facilities by the end of 2020 (using a baseline year of 2010) and increasing the portion of electricity we use derived from renewable sources;
- reducing direct water use by 50 percent adjusted for hours worked and achieving water neutrality at 15 sites by the end of 2020;
- increasing our recycling rate from 88 percent to 95 percent and achieving zero disposal at 30 sites by the end of 2020 and
- utilizing the most efficient methods and modes to move goods across our network to reduce carbon dioxide per kilogram of goods moved by 10 percent by the end of 2020.

*      *      *

***We continue to articulate our positions on key public policy issues and on a wide range of environmental issues***.  ***We are actively engaged with regulatory, industry and other stakeholder groups around the world as greenhouse gases (GHG) and fuel efficiency standards become more prevalent globally***.  We were named number 24 in Newsweek's Most Responsible Companies ranking, number 50 among Barron's Top 100 Most Sustainable Companies as well as named to the Dow Jones North American Sustainability Index for the fifteenth consecutive year in 2020.

84.    The 2020 Form 10-K also contained disclosures that overstated Cummins' commitment to environmental compliance, stating:

Our engines are subject to extensive statutory and regulatory requirements that directly or indirectly impose standards governing emissions and noise.  Over the past several years we have increased our

- 41 -

global environmental compliance presence and expertise to understand and meet emerging product environmental regulations around the world. Our ability to comply with these and future emission standards is an essential element in maintaining our leadership position in regulated markets. We have made, and will continue to make, significant capital and research expenditures to comply with these standards.

We strive to be a leader in developing and implementing technologies that provide customers with the highest performing products while minimizing the impact on the environment, and we have a long history of working with governments and regulators to achieve these goals. We remain committed to ensuring our products meet all current and future emission standards and delivering value to our customers.

Formed in 2019, the Product Compliance and Regulatory Affairs team leads both engine emissions certification and compliance and regulatory affairs initiatives. This organization is led by the Vice President – Product Compliance and Regulatory Affairs who reports directly to the Chief Executive Officer, and the new Vice President joins the Cummins Executive Team and Cummins Leadership Team. The focus of this organization is to strengthen our ability to design great products that help our customers win while ensuring compliance with increasingly challenging global emission regulations. The organization also works to enhance our collaboration with the agencies setting the direction and regulations of emissions to best ensure we are meeting every expectation today while planning for future changes.

Following conversations with the U.S. Environmental Protection Agency (EPA) and California Air Resources Board (CARB) regarding certification for the engines in the 2019 RAM 2500 and 3500 trucks, we made the decision to review our certification process and compliance with emission standards. This review is being conducted with external advisers to ensure the certification and all of our processes for our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. In addition, we voluntarily disclosed our formal internal review to the regulators and to other government agencies, the Department of Justice (DOJ) and the Securities and Exchange Commission (SEC), and worked cooperatively with them to ensure a complete and thorough review. ***We fully cooperated with the DOJ's and the SEC's information requests and inquiries and, based on recent communications with these agencies, we do not expect further inquiries***[.]

85.     On May 4, 2021, August 3, 2021, and November 2, 2021, the Company filed with the SEC its Quarterly Reports on Forms 10-Q for the first quarter ended April 4, 2021 (the "Q1 2021 Form 10-Q"), second quarter ended July 4, 2021 (the "Q2 2021 Form 10-Q"), and third quarter ended October 3, 2021 (the "Q3 2021 Form 10-Q "), respectively. The Q1 2021 Form 10-Q and Q2 2021 Form 10-Q each incorporated by reference the risk disclosures in the 2020 Form 10-K that were discussed above.

86.     The Q3 2021 Form 10-Q contained the risk disclosure regarding the engines shipped since September 2019, but failed to disclose that Cummins was still producing engines with unlawful emission control devices. In particular, the Q3 2021 Form 10-Q stated:

*We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pickup truck applications and are working with the U.S. Environmental Protection Agency (EPA) and California Air Resources Board (CARB) to address their questions about these applications.  Due to the continuing nature of our formal internal review and on-going discussions with EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.*

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks.  During conversations with the EPA and CARB about the effectiveness of our pickup truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.  As a result, our internal review focuses, in part, on the regulators' concerns.  We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements.  ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped***

*since September 2019.  During our discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018.*  We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance.

87.    On February 8, 2022, Cummins filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 Form 10-K ").  The 2021 Form 10-K contained the risk disclosure regarding the engines shipped since September 2019, but failed to disclose that Cummins was still producing engines with unlawful emission control devices.  In particular, the 2021 Form 10-K stated:

*We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pickup truck applications and are working with the EPA and CARB to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with the EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.*

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500

trucks.   During conversations with the EPA and CARB about the effectiveness of our pickup truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.   As a result, our internal review focuses, in part, on the regulators' concerns.   We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements.   ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019***.   During our discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018.   ***We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance***.

Due to the continuing nature of the formal review, our ongoing cooperation with the regulators and the presence of many unknown facts and circumstances, we are not yet able to estimate the financial impact of these matters.   It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

88.     The 2021 Form 10-K also contained risk disclosures concerning the Company's regulatory environment, but failed to disclose that the production of engines with unlawful emissions control devices would raise the risk of regulatory enforcement and penalties.  In particular, the 2021 Form 10-K stated:

*Our products are subject to extensive statutory and regulatory requirements that can significantly increase our costs and, along with increased scrutiny from regulatory agencies and unpredictability in the adoption, implementation and enforcement of increasingly stringent and fragmented emission standards by multiple jurisdictions around the world, could have a material adverse impact on our results of operations, financial condition and cash flows.*

Our engines are subject to extensive statutory and regulatory requirements governing emissions and noise, including standards imposed by the EPA, the EU, state regulatory agencies (such as the CARB) and other regulatory agencies around the world.  *Regulatory agencies are making certification and compliance with emissions and noise standards more stringent and subjecting diesel engine products to an increasing level of scrutiny.  The discovery of noncompliance issues could have a material adverse impact on our results of operations, financial condition and cash flows*.

Developing engines and components to meet more stringent and changing regulatory requirements, with different implementation timelines and emission requirements, makes developing engines efficiently for multiple markets complicated and could result in substantial additional costs that may be difficult to recover in certain

markets.  While we have met previous deadlines, our ability to comply with existing and future regulatory standards will be essential for us to maintain our competitive position in the engine applications and industries we serve.  The successful development and introduction of new and enhanced products in order to comply with new regulatory requirements are subject to other risks, such as delays in product development, cost over-runs and unanticipated technical and manufacturing difficulties.

In addition to these risks, the nature and timing of government implementation and enforcement of increasingly stringent emission standards in our worldwide markets are unpredictable and subject to change.  Any delays in implementation or enforcement could result in a loss of our competitive advantage and could have a material adverse impact on our results of operations, financial condition and cash flows.

89.    The 2021 Form 10-K also contained disclosures that overstated the Company's commitment to environmental sustainability, stating:

We are committed to making people's lives better by powering a more prosperous world.  That prosperity includes strong communities, robust business and environmental sustainability.

The highest level of accountability for our climate-related risks and opportunities is with the Safety, Environment and Technology (SET) Committee of the Board of Directors (the Board).  The internal Action Committee for Environmental Sustainability meets monthly and reports to the Chairman and to the SET Committee at least annually.

*In late 2019, we introduced PLANET 2050, a sustainability strategy focused on three priority areas: addressing climate change and air emissions*, using natural resources in the most sustainable way and improving communities. Additional commitments followed in 2021 with Cummins Water Works, which is our multi-million dollar program for strengthening communities through sustainable water and addressing the global water crisis. *The PLANET 2050 strategy includes nine specific goals to achieve by 2030, including science-based carbon dioxide reduction targets for newly sold products and facilities, as well as aspirational targets for 2050*. We are currently evaluating how the new goals will be integrated into business planning and will report on progress beginning in 2022. Key areas of focus in 2021 included product decarbonization pathways, customer sustainability collaboration and circular economy efforts such as incorporating expanded lifecycle analysis tools.

The nine PLANET 2050 goals for 2030 are as follows:
- Reduce absolute greenhouse gas (GHG) emissions from facilities and operations by 50 percent.
- *Reduce scope three absolute lifetime GHG emissions from newly sold products by 25 percent.*
- Partner with customers to reduce scope three GHG emissions from products in the field by 55 million metric tons.
- Reduce volatile organic compounds emissions from paint and coating operations by 50 percent.
- Create a circular lifecycle plan for every part to use less, use better, use again.

- 49 -

- Generate 25 percent less waste in facilities and operations as percent of revenue.
- Reuse or responsibly recycle 100 percent of packaging plastics and eliminate single-use plastics in dining facilities, employee amenities and events.
- Reduce absolute water consumption in facilities and operations by 30 percent.
- Produce net water benefits that exceed our annual water use in all our regions.

*      *      *

We continue to articulate our positions on key public policy issues and on a wide range of environmental issues.  We are actively engaged around the world to promote science-based climate policies by working with regulatory, industry and other stakeholders, including joining advocacy groups and testifying before legislators and regulators.  We will continue to work in partnership with others to advocate for tough, clear and enforceable regulations around the globe to address air and GHG emissions.  In 2021, we were named to the S&P Dow Jones World and North American Sustainability Indices.  It was the sixteenth consecutive time we were named to the North American index and the first time we were named to the world index since 2013.  We were also named one of the inaugural recipients of the Prince Charles' Terra Carta Seal, recognizing companies for their leadership in climate action and sustainability.

We were named to Investor Business Daily's Best ESG Companies list for performance on environmental, social and governance matters,

ranking number 37.  We were also ranked number 84 among Barron's Top 100 Most Sustainable Companies.

90.   The 2021 Form 10-K also contained disclosures that overstated Cummins' commitment to environmental compliance, stating:

> Our engines are subject to extensive statutory and regulatory requirements that directly or indirectly impose standards governing emissions and noise.  Over the past several years we have increased our global environmental compliance presence and expertise to understand and meet emerging product environmental regulations around the world.  Our ability to comply with these and future emission standards is an essential element in maintaining our leadership position in regulated markets.  We made, and will continue to make, significant capital and research expenditures to comply with these standards.
>
> We strive to be a leader in developing and implementing technologies that provide customers with the highest performing products while minimizing the impact on the environment, and we have a long history of working with governments and regulators to achieve these goals.  We remain committed to ensuring our products meet all current and future emission standards and delivering value to our customers.
>
> Formed in 2019, the Product Compliance and Regulatory Affairs team leads both engine emissions certification and compliance and regulatory affairs initiatives and is overseen and reports directly to the SET Committee of the Board at least annually.  This organization is led by the Vice President - Product Compliance and Regulatory Affairs who reports directly to the Chief Executive Officer. The Vice President

is a member of both the Cummins Executive Team and Cummins Leadership Team. ***The focus of this organization is to strengthen our ability to design great products that help our customers win while complying with increasingly challenging global emission regulations***. The organization also works to enhance our collaboration with the agencies setting the direction and regulations of emissions as we strive to meet every expectation today while planning for future changes.

Following conversations with the U.S. Environmental Protection Agency (EPA) and California Air Resources Board (CARB) regarding certification for the engines in the 2019 RAM 2500 and 3500 trucks, we made the decision to review our certification process and compliance with emission standards. ***This review is being conducted with external advisers as we strive to ensure the certification and all of our processes for our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws***. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019***. During our discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018. We will continue to work together closely with the

relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance.

91.     On May 3, 2022, the Company filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2022 (the "Q1 2022 Form 10-Q").  The Q1 2022 Form 10-Q contained the risk disclosure regarding the engines shipped since September 2019, and stated that a recall was coming, but failed to disclose that Cummins was still producing engines with unlawful emission control devices.  In particular, the Q1 2022 Form 10-Q stated:

> **We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pickup truck applications and are working with the EPA and CARB to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with the EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.**

> We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, **following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks.  During conversations with the EPA and CARB about the effectiveness of our pickup truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as**

***defeat devices***. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019.*** During our discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018. In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. ***We accrued $30 million for the recall during the first quarter of 2022, an amount that reflects our current estimate of the cost of the recall.***

We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement and seek to reach further resolutions as part of our ongoing commitment to compliance. Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters. It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

92.     On August 3, 2022 and November 4, 2022, the Company filed with the SEC its Quarterly Reports on Forms 10-Q for the second quarter ended June 30, 2022 (the "Q2 2022 Form 10-Q") and third quarter ended September 30, 2022 (the "Q3 2022 Form 10-Q"), respectively.  The Q2 2022 Form 10-Q contained the risk disclosure regarding the engines shipped since September 2019, but failed to disclose that Cummins was still producing engines with unlawful emission control devices.  In particular, the Q2 2022 Form 10-Q stated:

*We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pickup truck applications and are working with the EPA and CARB to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with the EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.*

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks.  During conversations with the EPA and CARB about the effectiveness of our pickup truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.  As a result, our internal review focuses, in part, on the

regulators' concerns.  ***We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements***.  ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019***.  During our discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018.  In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks.  We accrued $30 million for the recall during the first quarter of 2022, an amount that reflects our current estimate of the cost of the recall.

93.    The Q3 2022 Form 10-Q contained a risk disclosure similar to the Q2 2022 Form 10-Q, stating:

> ***We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pickup truck applications and are working with the EPA and CARB to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with the EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.***

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks.   During conversations with the EPA and CARB about the effectiveness of our pickup truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.   As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements.   Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019.  During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018 and Titan trucks for model years 2016 through 2019.   In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks.  We accrued $30 million for the RAM recall during the first quarter of 2022, an amount that reflected our current estimate of the cost of that recall.  We are also developing a new software calibration and hardware fix and will recall model years 2016

through 2019 Titan trucks.  We accrued $29 million for the Titan recall during the third quarter of 2022, an amount that reflected our current estimate of the cost of that recall.

*We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement and seek to reach further resolutions as part of our ongoing commitment to compliance*.  Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters.  It is possible that the consequences resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

94.     On February 14, 2023, Cummins filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Form 10-K").  The 2022 Form 10-K contained the risk disclosure regarding the engines shipped since September 2019, but failed to disclose that Cummins was still producing engines with unlawful emission control devices.  In particular, the 2022 Form 10-K stated:

*We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pickup truck applications and are working with the EPA and CARB to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with the EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.*

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks.  During conversations with the EPA and CARB about the effectiveness of our pickup truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.  As a result, our internal review focuses, in part, on the regulators' concerns.  We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements.  ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019***.  During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018 and Titan trucks for model years 2016 through 2019.  We have also been in communication with Environmental and Climate Change Canada regarding similar issues relating to some of these very same platforms.  ***In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks***.  We accrued $30 million for the RAM recall during the first quarter of 2022, an amount

that reflected our current estimate of the cost of that recall.  ***We are also developing a new software calibration and hardware fix and will recall model years 2016 through 2019 Titan trucks.  We accrued $29 million for the Titan recall during the third quarter of 2022, an amount that reflected our current estimate of the cost of that recall***.

We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement and seek to reach further resolutions as part of our ongoing commitment to compliance.  ***Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters.  It is possible that the consequences resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows***.

95.    The 2022 Form 10-K also contained risk disclosures concerning the Company's regulatory environment, but failed to disclose that the production of engines with unlawful emissions control devices would raise the risk of regulatory enforcement and penalties, stating:

***Our products are subject to extensive statutory and regulatory requirements that can significantly increase our costs and, along with increased scrutiny from regulatory agencies and unpredictability in the adoption, implementation and enforcement of increasingly stringent and fragmented emission standards by multiple jurisdictions around the world, could have a material adverse impact on our results of operations, financial condition and cash flows.***

Our engines are subject to extensive statutory and regulatory requirements governing emissions and noise, including standards imposed by the EPA, the EU, state regulatory agencies (such as the CARB) and other regulatory agencies around the world. Regulatory agencies are making certification and compliance with emissions and noise standards more stringent and subjecting diesel engine products to an increasing level of scrutiny. *The discovery of noncompliance issues could have a material adverse impact on our results of operations, financial condition and cash flows*.

Developing engines and components to meet more stringent and changing regulatory requirements, with different implementation timelines and emission requirements, makes developing engines efficiently for multiple markets complicated and could result in substantial additional costs that may be difficult to recover in certain markets. *While we have met previous deadlines, our ability to comply with existing and future regulatory standards will be essential for us to maintain our competitive position in the engine applications and industries we serve*. The successful development and introduction of new and enhanced products in order to comply with new regulatory requirements are subject to other risks, such as delays in product development, cost over-runs and unanticipated technical and manufacturing difficulties.

In addition to these risks, the nature and timing of government implementation and enforcement of increasingly stringent emission standards in our worldwide markets are unpredictable and subject to

change. Any delays in implementation or enforcement could result in a loss of our competitive advantage and could have a material adverse impact on our results of operations, financial condition and cash flows.

96.     The 2022 Form 10-K also contained disclosures that overstated Cummins' commitment to environmental sustainability, stating:

*We are committed to making people's lives better by powering a more prosperous world. That prosperity includes strong communities, robust business and environmental sustainability.*

The highest level of accountability for our climate-related risks and opportunities is with the Safety, Environment and Technology (SET) Committee of the Board of Directors (the Board). The internal Action Committee for Environmental Sustainability meets monthly and reports to the Chief Executive Officer (CEO) and to the SET Committee at least annually.

*In 2019, we introduced PLANET 2050, a sustainability strategy focused on three priority areas: addressing climate change and air emissions, using natural resources in the most sustainable way and improving communities*. Additional commitments followed including Cummins Water Works, our program for strengthening communities through sustainable water and addressing the global water crisis, and Destination Zero, our long term product decarbonization strategy. The PLANET 2050 strategy includes nine specific goals to achieve by 2030, including science-based carbon dioxide reduction targets for newly sold products and facilities, as well as aspirational targets for 2050. We started reporting progress in 2022. Key areas of focus in 2022 included

product decarbonization pathways, customer sustainability collaboration and circular economy efforts such as incorporating expanded lifecycle analysis tools.

The nine PLANET 2050 goals for 2030 are as follows:

- Reduce absolute greenhouse gas (GHG) emissions from facilities and operations by 50 percent.
- Reduce scope three absolute lifetime GHG emissions from newly sold products by 25 percent.
- Partner with customers to reduce scope three GHG emissions from products in the field by 55 million metric tons.
- Reduce volatile organic compounds emissions from paint and coating operations by 50 percent.
- Create a circular lifecycle plan for every part to use less, use better, use again.
- Generate 25 percent less waste in facilities and operations as percent of revenue.
- Reuse or responsibly recycle 100 percent of packaging plastics and eliminate single-use plastics in dining facilities, employee amenities and events.
- Reduce absolute water consumption in facilities and operations by 30 percent.
- Produce net water benefits that exceed our annual water use in all our regions.

*     *     *

**We continue to articulate our positions on key public policy issues and on a wide range of environmental issues.  We are actively**

*engaged around the world to promote science-based climate policies by working with regulatory, industry and other stakeholders, including joining advocacy groups and testifying before legislators and regulators*.  We will continue to work in partnership with others to advocate for tough, clear and enforceable regulations around the globe to address air and GHG emissions.  In 2022, we were named to the S&P Dow Jones World and North American Sustainability Indices. It was the seventeenth consecutive time we were named to the North American index and the second time we were named to the world index since 2013.  In 2021, we were named one of the inaugural recipients of the Terra Carta Seal by the Sustainable Markets Initiative, the effort founded by King Charles III while the Prince of Wales to recognize industry leaders in environmental sustainability.  In addition, in 2022 we were awarded a gold medal for sustainability performance by EcoVadis, a globally collaborative platform for trading partners to share sustainability performance information.

We were named to Investor Business Daily's Best ESG Companies list for performance on environmental, social and governance matters, ranking number 27.  We were also ranked number 47 among Barron's Top 100 Most Sustainable Companies.

97.    The 2022 Form 10-K also contained disclosures that overstated Cummins' commitment to environmental compliance, stating:

Our engines are subject to extensive statutory and regulatory requirements that directly or indirectly impose standards governing emissions and noise.  Over the past several years we have increased our global environmental compliance presence and expertise to understand

and meet emerging product environmental regulations around the world. Our ability to comply with these and future emission standards is an essential element in maintaining our leadership position in regulated markets.

We strive to be a leader in developing and implementing technologies that provide customers with the highest performing products while minimizing the impact on the environment, and we have a long history of working with governments and regulators to achieve these goals. We remain committed to ensuring our products meet all current and future emission standards and delivering value to our customers.

Announced in late 2019 and launched in early 2020, the Product Compliance and Regulatory Affairs team leads both engine emissions certification and compliance and regulatory affairs initiatives and reports to the SET Committee of the Board at least annually. This organization is led by the Vice President - Product Compliance and Regulatory Affairs. The focus of this organization is to strengthen our ability to design great products that help our customers win while complying with increasingly challenging global emission regulations. The organization also works to enhance our collaboration with the agencies setting the direction and regulations of emissions as we strive to meet every expectation today while planning for future changes.

Following conversations with the U.S. Environmental Protection Agency (EPA) and California Air Resources Board (CARB) regarding certification for the engines in the 2019 RAM 2500 and 3500 trucks,

we made the decision to review our certification process and compliance with emission standards. ***This review is being conducted with external advisors as we strive to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws***. During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. ***We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements***. ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019.*** During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018 and Titan trucks for model years 2016 through 2019. We have also been in communication with Environmental and Climate Change Canada regarding similar issues relating to some of these very same platforms. In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. We are also developing a new software calibration and hardware fix and will recall model years

2016 through 2019 Titan trucks.  We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance.

98.     On May 2, 2023, August 3, 2023, and November 2, 2023 the Company filed with the SEC its Quarterly Reports on Forms 10-Q for the first quarter ended March 31, 2023 (the "Q1 2023 Form 10-Q"), second quarter ended June 30, 2023 (the "Q2 2023 Form 10-Q"), and third quarter ended September 30, 2023 (the "Q3 2023 Form 10-Q"), respectively.  The Q1 2023 Form 10-Q, Q2 2023 Form 10-Q, and Q3 2023 Form 10-Q contained a substantially similar risk disclosures to the one discussed in the 2022 Form 10-K regarding the engines shipped since September 2019, and similarly failed to disclose that Cummins was still producing engines with unlawful emission control devices.

99.     The above statements were materially false and misleading because they misrepresent and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects.  Specifically, the Individual Defendants made false and misleading statements and failed to disclose that: (i) Cummins continued to produce engines with unlawful emission defeating devices from 2019 to 2023; (ii) accordingly, Cummins understated its legal and regulatory risk, and overstated its commitment to environmental protection; and (iii) as a result, the Individual Defendants' statements about Cummins' business, operations, and prospects, were materially false and misleading and lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

100.   On December 22, 2023, before the market opened, the Company filed with the SEC a Current Report on Form 8-K in which it announced a $2.04 billion

charge related to the EPA's and CARB's investigations.  In particular, the Form 8-K stated:

On December 22, 2023, Cummins Inc. (the "Company") issued a press release announcing that the Company has reached an agreement in principle with the U.S. Environmental Protection Agency, the California Air Resources Board ("CARB"), *the Environmental and Natural Resources Division of the U.S. Department of Justice* and the California Attorney General's Office *to resolve civil claims regarding the Company's emissions certification and compliance process for certain engines primarily used in pick-up truck applications in the United States (collectively, the "Agreement in Principle").*  The Agreement in Principle relates to the ongoing formal review of the Company's emissions certification process and compliance with emissions standards for certain pickup truck applications.  *The Company first announced this review on April 29, 2019*, has since provided regular updates in periodic filings with the Securities and Exchange Commission and is continuing to cooperate with Environment and Climate Change Canada ("ECCC") with respect to ECCC's requests for certification-related information for certain pick-up truck applications.

*The Company expects to record a charge of approximately $2.04 billion in the fourth quarter of 2023 to resolve these claims and related matters.*  Certain additional related immaterial charges will likely be incurred as these matters are fully concluded. The Company is in a strong financial position with existing liquidity and access to

capital to satisfy obligations associated with the settlement, support ongoing obligations and execute its growth strategy.

101.   On the same day, the DOJ issued a press release titled "Attorney General Merrick Garland Statement on the Agreement in Principle with Cummins to Settle Alleged Installation of Illegal Defeat Devices in Engines."  The DOJ press release stated that Cummins "allegedly installed defeat devices on 630,000 model year 2013 to 2019 RAM 2500 and 3500 pickup truck engines", but then revealed that Cummins **"also allegedly installed undisclosed auxiliary emission control devices on 330,000 model year 2019 to 2023 RAM 2500 and 3500 pickup truck engines,"** revealing that the Company engaged in malfeasance for years after it disclosed the review of its compliance with emissions standards.  The press release further stated that the penalty was the "Largest Ever for a Clean Air Act Violation and the Second Largest Ever Environmental Penalty."  The DOJ's press release quoted Attorney General Garland, stating:

> The Justice Department is committed to vigorously enforcing the environmental laws that protect the American people from harmful pollutants.
>
> **Today, the Justice Department reached an initial agreement with Cummins Inc. to settle claims that, over the past decade, the company unlawfully altered hundreds of thousands of engines to bypass emissions tests in violation of the Clean Air Act.**  As part of the agreement, the Justice Department will require Cummins to pay $1.675 billion, **the largest civil penalty we have ever secured under the Clean Air Act, and the second largest environmental penalty ever secured**.

*The types of devices we allege that Cummins installed in its engines to cheat federal environmental laws have a significant and harmful impact on people's health and safety.  For example, in this case, our preliminary estimates suggest that defeat devices on some Cummins engines have caused them to produce thousands of tons of excess emissions of nitrogen oxides*.  The cascading effect of those pollutants can, over long-term exposure, lead to breathing issues like asthma and respiratory infections.

102.   On this news, Cummins' stock plunged more than 2.87%, or $7.01 per share, on December 22, 2023, to close at $236.99 per share compared to the previous trading day's closing of $244 per share, erasing $993.6 million in market capitalization.

103.   On January 10, 2024, the DOJ released the details of the settlement. In addition to the $1.675 billion penalty, the Company agreed to $325 million to remedy the violations, including funding pollution mitigation projects, and recalling 600,000 2013-2019 RAM 2500 and 3500 trucks.  Cummins agreed to fund mitigation actions or projects that reduce NOx emissions in California through CARB mitigation programs.  For the rest of the country, Cummins agreed to offset NOx reductions by working with railroad locomotive owners on two types of locomotive emission reduction projects.  First, Cummins will finance and ensure the replacement of twenty-seven old, high-emitting diesel locomotive engines with new, low-emitting diesel or electric engines.  Second, Cummins will fund and complete fifty projects that will reduce idling time for diesel-powered switch locomotives to reduce fuel usage and emissions of NOx, particulate matter, volatile organic compounds, and carbon dioxide.

104.   On this news, Cummins' stock plunged more than 2.57%, or $6.14 per share, over several days, to close at $233.08 per share on January 17, 2024.

Compared to January 10, 2024's closing price of $239.22 per share, the news erased over $870 million in market capitalization.

## REASONS THE STATEMENTS WERE IMPROPER

105.   The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    that the Company was producing and selling engines with illegal emissions control devices; and

(b)    as a result of the foregoing, the Individual Defendants' representations concerning EPA and CARB investigations, the Company's environmental compliance and sustainability, and risks of an adverse material financial impact were improper.

## DAMAGES TO CUMMINS

106.   As a result of the Individual Defendants' actions, the Company has suffered $2.04 billion in damages related to the regulatory penalty and the recall. As a result of the Individual Defendants' improprieties, Cummins disseminated improper, public statements concerning the Company's engine production.  These improper statements have devastated Cummins' credibility as reflected by the Company's $6.8 billion, or 26%, market capitalization loss.

107.   Cummins' performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Cummins' current and potential customers consider a company's ability to accurately value its business prospects and evaluate sales and growth potential as well as perform on contracts.  Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions, companies that are unable to perform on contracts, and companies that have problems providing quality

service.  Especially when the company in question is producing engines with illegal devices.  Cummins' ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

108.  Further, as a direct and proximate result of the Individual Defendants' actions, Cummins has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)  costs incurred from defending and paying any settlement in the 2023 Consumer Class Action;

(b)  costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(c)  tens of millions of dollars to recall the 2013-2019 RAM 2500 and 3500 trucks;

(d)  $2.04 billion incurred from the DOJ penalty and the remediation; and

(e)  costs incurred from compensation and benefits paid to the defendants who have breached their duties to Cummins.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109.  Plaintiff brings this action derivatively in the right and for the benefit of Cummins to redress injuries suffered, and to be suffered, by Cummins as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Cummins is named as a nominal defendant solely in a derivative capacity.

110.  Plaintiff will adequately and fairly represent the interests of Cummins in enforcing and prosecuting its rights.

111.   Plaintiff was a stockholder of Cummins at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Cummins stockholder.

112.   The current Board of Cummins consists of the following twelve individuals: defendants Rumsey, Bernhard, Di Leo, Dobbs, Belske, Harris, Lynch, Miller, G. Nelson, K. Nelson, and Quintos (the "Current Director Defendants") and non-defendant Fisher.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Current Director Defendants Face a Substantial Likelihood of Liability for Their Misconduct**

113.   As alleged above, defendants Rumsey, Bernhard, Di Leo, Dobbs, Belske, Harris, Lynch, Miller, G. Nelson, K. Nelson, and Quintos breached their fiduciary duties of loyalty by directing or allowing the Company to produce engines with illegal emissions control devices.  The Current Director Defendants further breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding emissions control devices in the Company's engines and the subsequent regulatory investigations.

114.   The Company's decades-long history of constantly violating the Clean Air Act served as red flags for the Board to know about Cummins' continued violations.  In particular, in 1998, the EPA found that the Company violated the Clean Air Act.  The Company then violated the Consent Decree filed to resolve the 1998 violations on three separate occasions from 2006 through 2010, resulting in millions of dollars in fines and remediation efforts.  Then, in February 2010, Cummins agreed to pay a $2.1 million penalty and recall hundreds of engines to resolve more Clean Air Act violations.  Since 2016, the Company has been subject to the 2016 Consumer Class Action—a lawsuit that focuses on defeat devices used

in 2007-2012 RAM 2500 and 3500 trucks.  Finally, in 2018, the Company issued a recall for over 500,000 2010-2015 medium and heavy-duty trucks due to excessive NOx emissions.  Although the 2018 recall was not for defeat devices, 232,000 RAM 2500 and 3500 trucks were part of the 2018 recall and remained equipped with the illegal emissions control devices.

115.  The Current Director Defendants ignored these red flags.  As a result, the Company continued to violate the Clean Air Act which led to a $1.675 billion penalty and $325 million in remediation measures to settle the DOJ and CARB investigations.  Accordingly, the Current Director Defendants face a substantial likelihood of liability for ignoring red flags and failing to oversee the Company's compliance with the Clean Air Act.

116.  Defendants Bernhard, Dobbs, Belske, Miller, G. Nelson, K. Nelson, and Quintos, as members of the Audit Committee, reviewed and approved the improper statements.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

117.  Any suit by the current directors of Cummins to remedy these wrongs would expose defendants Rumsey, Linebarger, Smith, and Cummins to liability for violations of the federal securities laws in the pending Securities Class Action, and

would result in civil actions being filed against one or more of the other Individual Defendants.  The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act.  If the Board elects for the Company to press forward with its right of action against defendants Rumsey, Linebarger, and Smith in this action, then Cummins' efforts would compromise its defense of the Securities Class Action.  Accordingly, demand on the Board is excused.

118.   Defendant Rumsey lacks independence from the Board.  The principal professional occupation of defendant Rumsey is her employment with Cummins, pursuant to which she has received and continues to receive substantial monetary compensation and other benefits as alleged above.  Accordingly, defendant Rumsey lacks independence from defendants Bernhard, Di Leo, Dobbs, Belske, Harris, Lynch, Miller, G. Nelson, K. Nelson, and Quintos due to her interest in maintaining her executive position at Cummins.  This lack of independence renders defendant Rumsey incapable of impartially considering a demand to commence and vigorously prosecute this action.  In 2022 and 2021, Cummins paid defendant Rumsey over $7.1 million and over $3.6 million, respectively.

119.   Accordingly, defendant Rumsey is incapable of impartially considering a demand to commence and vigorously prosecute this action because she has an interest in maintaining her principal occupation and the substantial compensation she receives in connection with that occupation.  Further, the Company admits in its most recent Proxy Statement filed with the SEC on March 27, 2023, that defendant Rumsey is not independent.  Demand is futile as to defendant Rumsey.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

120.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.   The Individual Defendants owed and owe Cummins fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Cummins the highest obligation of care and loyalty.

122.   The Individual Defendants and each of them, violated and breached their fiduciary duties.

123.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that the Company was producing engines with illegal emissions control devices and materially misleading investors regarding the subsequent regulatory investigations that led to a material adverse financial impact on the Company.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

124.   The Director Defendants, as directors of the Company, owed Cummins the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning illegal emissions control devices in engines and the materially misleading statements concerning regulatory intervention.  The Director Defendants knew or were reckless in not knowing that the Company was producing engines with illegal emissions control devices and materially misleading investors regarding the subsequent regulatory investigations that led to a material adverse financial impact on the Company.  Accordingly, these defendants breached their duty of loyalty to the Company.

125.   The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to

appropriately oversee regulatory compliance and disclosure controls, as required by the Audit Committee Charter in effect at the time.

126.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Cummins has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

127.   Plaintiff, on behalf of Cummins, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

128.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.   As a result of the illegal emissions devices and materially false and misleading statements, the Individual Defendants have caused Cummins to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

130.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

131.   Plaintiff, on behalf of Cummins, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

132.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Cummins.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Cummins.

134.   Plaintiff, as a stockholder and representative of Cummins, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

135.   Plaintiff, on behalf of Cummins, has no adequate remedy at law.

## COUNT IV

**Against Defendants Rumsey, Linebarger, and Smith for Contribution Under Sections 10(b), 20(a), and 21D of the Exchange Act**

136.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137.   Cummins, and defendants Rumsey, Linebarger, and Smith are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to defendants Rumsey's, Linebarger's, and Smith's willful and reckless violations of their obligations as officers and directors of Cummins.

138.   Defendants Rumsey, Linebarger, and Smith, because of their positions of control and authority as CEO and CFO of Cummins, were able to and did, directly or indirectly, exercise control over the business and corporate affairs of Cummins, including the wrongful acts complained of herein and in the Securities Class Action.

139.   Accordingly, defendants Rumsey, Linebarger, and Smith are liable under 15 U.S.C. §78j(b), which creates a private right of action for contribution, and section 21D of the Exchange Act, 15 U.S.C. §78u-4(f), which governs the

application of a private right of action for contribution arising out of violations of the Exchange Act.

140.    As such, Cummins is entitled to receive all appropriate contribution or indemnification from defendants Rumsey, Linebarger, and Smith.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Cummins, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and contribution;

B.    Directing Cummins to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Cummins and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over regulatory compliance;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.    a provision to permit the stockholders of Cummins to nominate at least three candidates for election to the Board; and

4.    a proposal to strengthen Cummins' oversight of its disclosure procedures and regulatory compliance;

C.     Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Cummins has an effective remedy;

D.     Awarding to Cummins restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  February 5, 2024

ROBBINS LLP
BRIAN J. ROBBINS
KEVIN A. SEELY

/s/*Brian J. Robbins*

BRIAN J. ROBBINS
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile (619) 525-3991
E-mail:  brobbins@robbinsllp.com
        kseely@robbinsllp.com

LEVI & KORSINSKY, LLP
Gregory M. Nespole
Daniel Tepper
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
E-mail: gnespole@zlk.com
        dtepper@zlk.com

Attorneys for Plaintiff

**VERIFICATION**

I, Michael Mongiello, trustee to the CATHERINE M. SUGARBAKER FAMILY TRUST, MICHAEL MONGIELLO TRUSTEE, U/A DTD 11/08/21 (the "Trust") under penalties of perjury, hereby do declare that I am authorized to act on behalf of the Trust, which will be serving as  plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Date:   February 5, 2024

_____
Michael Mongiello
Trustee